1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ELIJAH GOETHE,                          No.  2:18-cv-02297 DAD AC

12              Petitioner,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   STUART SHERMAN, Warden,

15              Respondent.

16

17        Petitioner is a California state prisoner proceeding through counsel with an application for

18   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed

19   on August 22, 2018, ECF No. 1, which challenges petitioner's 2013 conviction for first degree

20   murder and related offenses.  Respondent has answered, ECF No. 9, and petitioner has filed a

21   traverse, ECF No. 19.

22                              BACKGROUND

23   I.      Proceedings In the Trial Court

24        A.  Preliminary Proceedings

25        Petitioner was charged in Sacramento County with the murder of one victim and the

26   attempted murder of another, two counts of discharging a firearm at an occupied motor vehicle,

27   and various sentencing enhancements.  The charges arose from the shooting of two men in a

28   parked car by two men in an SUV, apparently in retaliation for a gang-related shooting that had

                                         1

1  happened about two hours before.  The victims, D'Andre Lawrence and Joseph Washington, were

2  not gang affiliated.  The prosecutor's theory of the case was that petitioner, a gang member, was

3  the passenger in the SUV and fired the shot that wounded Lawrence, and petitioner's friend was

4  the driver of the SUV and the person who fatally shot Washington.

5      Petitioner pled not guilty, and the case went to trial.

6      B.  The Evidence Presented at Trial[1]

7          1.  Prosecution Case

8      Around 2:00 a.m. on Sunday, October 12, 2008, Oak Park Blood gang members were shot

9  at the AM/PM gas station market at 4th Avenue and 65th Street in Sacramento. The suspects were

10  members of the Killa Mobb street gang.  One of the shooting victims was petitioner's friend

11  Wesley Taylor.

12      Approximately two hours after the AM/PM market shooting, D'Andre Lawrence parked

13  his Buick in front of a friend's house in Sacramento.  Lawrence's cousin, Joseph Washington,

14  was in the Buick with him, and the two of them were waiting for a phone call from Lawrence's

15  girlfriend.

16      Suddenly, an SUV pulled up in front of Lawrence's Buick.  The SUV's passenger jumped

17  out and pointed a .38-caliber revolver at Lawrence.  As the passenger approached the Buick's

18  driver's side, Lawrence gave a quick glance and saw the SUV's driver approaching the Buick's

19  right side where Washington was.  Back on the driver's side, the SUV's passenger opened the

20  Buick's driver's side door and shot Lawrence in the face.  When Lawrence came to, he saw

21  Washington on the other side of the Buick, sprawled out and immobile.  Lawrence called 911.

22      A neighbor on another street, Jesus Rangel, heard the shootings when he was outside

23  leaving for work.  He heard a first gunshot, turned to walk back to his house, and then heard the

24  second gunshot.  After the second, he saw two young men run toward their blue Blazer SUV and

25  then drive away.

26

27  [1] The following summary of the evidence is adapted from the opinion of the California Court of
   Appeal, Lodged Doc. 6 (ECF No. 10-15).  Petitioner has expressly adopted this statement of
28  facts.  ECF No. 1 at 7.

2

Police responded to the shootings shortly after being called.  Both Lawrence and Washington were taken to the hospital.  Washington was pronounced dead from swelling to his brain five hours after being admitted.  Lawrence survived, despite being shot in his left cheek.

Police lifted a latent fingerprint from the Buick's driver's side door and collected a spent .380-caliber shell casing near the Buick.  The fingerprint matched petitioner's.  The casing matched a gun that petitioner's uncle had fired while committing a crime a month earlier.

With petitioner as a suspect, police began surveilling the home of petitioner's father, Gary Goethe.  When police saw a blue Ford Explorer parked in front of the father's house, they took Rangel there to see if he could identify it.  Rangel said the Explorer looked similar to the SUV involved in the shootings.  On the exterior of the Explorer's passenger door was a characteristic gunshot residue particle and on the interior of the front driver's side door was a probable gunshot residue particle.  Petitioner's father said he never allowed petitioner to drive the Explorer.

Petitioner was arrested on October 15, 2008, and police interviewed him.  His friend Wes Taylor had been one of the shooting victims at the gas station on 65th Street.  Police showed petitioner pictures of Lawrence and Washington.  Petitioner said he had met Lawrence and Washington on the Thursday before the shootings and talked to them about buying Lawrence's Buick.  Petitioner got inside the car, offered $1,200 for it, Washington said, "maybe," and petitioner left.  (Lawrence denied ever meeting petitioner, testified he had never let anyone who wanted to buy his car sit in his car, and testified he was not with his cousin Washington on that Thursday.)

Police also talked to petitioner's father on the day of petitioner's arrest.  Detective Thomas Higgins of the Sacramento Police Department told the father "almost everything" at that point that implicated petitioner in the homicide.  The detective also told the father that the police believed that petitioner knew who the other shooter was and that police wanted to know.  Police officers then let the father talk to petitioner alone in the interview room.  The father-son conversation was recorded by one of two visible cameras and played for the jury.  Petitioner did not admit to the shooting or knowing anything about it.

///

3

Police looked into the cell phone records of petitioner and his friend Wes Taylor. Petitioner had been carrying around Taylor's phone since visiting Taylor in the hospital after Taylor had been shot.  In the hours before Washington and Lawrence were shot, petitioner exchanged a number of calls with his friend Semaj Douglas.  At 4:21 a.m., Douglas sent petitioner a text message saying, "Go 2 wes house and get the 223."  According to police, "223" is used when people are referring to a rifle using .223-caliber ammunition.  The cell phone tower records associated with petitioner's and Taylor's phones were also used to track petitioner's whereabouts when Washington and Lawrence were shot.  At 4:18 a.m., petitioner's cell phone accessed a cell phone tower at Florin Road and Luther Drive.  At 4:22 a.m., Taylor's phone accessed a cell phone tower on Franklin.

Police also looked into the records for Lawrence's cell phone.  Lawrence called 911 at 4:44 a.m. and that call accessed the cell phone tower at Florin Road and Luther Drive.  On December 3, 2008, petitioner's father had a conversation with a person who, unbeknownst to him, was a confidential informant.  The father told the confidential informant that he (the father) had asked petitioner, "Why did you do it?"  Petitioner replied, "Just because."  Then the father asked petitioner, "What's wrong with you?"

Detective John Houston testified as a gang expert, as follows.  The Oak Park Bloods is a large street gang in the Sacramento area.  Its rival is the G-Mobb street gang.  Detective Houston reviewed over 20 reports documenting petitioner's contact with various law enforcement entities and formed the opinion petitioner was an Oak Park Bloods gang member.  He also was of the opinion that, given a fact scenario similar to the one here, the shootings of Washington and Lawrence were committed for the benefit of the Oak Park Bloods.  It did not matter that the victims were not gang members and had nothing to do with the prior shootings because it showed that the Oak Park Bloods were "going to be out there" and were "going to hold people accountable, even if it is the wrong person."

///

///

///

4

1

      2.  Defense Case

2      According to petitioner's stepmother, petitioner did not have access to the house she

3  shared with petitioner's father.  During the time Lawrence and Washington were shot, the Ford

4  Explorer was parked in front of their house.  Petitioner did not have access to that car, either.

5      According to petitioner's girlfriend, Alia Young, she dropped petitioner off at the hospital

6  around 2:00 a.m. to see Wes Taylor after he had been shot.  Young then left the hospital to pick

7  up Taylor's girlfriend, and when Young returned, petitioner had already left the hospital and the

8  two women were unable to visit Taylor.  The two women went to the Youngs' house, where

9  petitioner was with Young's mother and father.  Around 5:00 a.m., the two women and petitioner

10  went back to the hospital to visit Taylor.  The three spent the night together at the Youngs' house

11  and went to church together the next morning.

12

      3.  Rebuttal Evidence

13      Detective Higgins checked the cell phone records of Young and petitioner.  There were a

14  number of calls between petitioner and his girlfriend between 4:12 a.m. and 4:14 a.m. on the

15  morning Washington and Lawrence were shot.  The cell towers indicated the girlfriend's location

16  was in the vicinity of the UC Davis Medical Center and petitioner's location was at Florin Road

17  and Luther Drive.

18      Detective Higgins also checked the pertinent cell phone records of petitioner and

19  Lawrence against petitioner's story about trying to buy Lawrence's Buick on the Thursday before

20  Lawrence and Washington were shot.  Based on the phone records, petitioner and Lawrence did

21  not "even remotely" intersect on that day.

22    C.  Outcome

23      The jury found petitioner guilty of Washington's first degree murder, Lawrence's

24  attempted murder, and two counts of discharging a firearm at an occupied vehicle, and found that

25  these crimes were committed for the benefit of a street gang.  The jury also found that a principal

26  personally discharged a firearm causing Washington's death and that petitioner personally

27  discharged a firearm causing Lawrence's great bodily injuries.

28  ///

On September 13, 2013, petitioner was sentenced to a total term of 75 years to life imprisonment (comprised of three consecutive 25 to life sentences), with a consecutive 19-year term, not including stayed sentences on some counts.

II.     Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on February 22, 2017.  Lodged Doc. 6 (ECF No. 10-15).  The California Supreme Court denied review on May 24, 2017.  Lodged Doc. 8 (ECF No. 10-17).

Petitioner filed no applications for state habeas relief.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade,

538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  <u>Id.</u> at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  <u>Id.</u> at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  <u>Id.</u> at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  <u>Frantz v. Hazey</u>, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In <u>Richter</u>, <u>supra</u>, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  <u>Richter</u>, 563 U.S. at 102.

DISCUSSION

I.   <u>Claim One: Admission of Testimonial Hearsay by Gang Expert Violated Petitioner's Due Process and Confrontation Rights</u>

A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

Petitioner contends that his rights to due process and confrontation of witnesses were violated by the gang expert's testimony regarding the contents of numerous police reports, which

7

1   recounted facts related to prior law enforcement contacts with petitioner in which the expert

2   witness had not been personally involved.  ECF No. 1 at 13-14.  Petitioner specifies as improperly

3   admitted hearsay Detective Huston's testimony regarding (1) a 2007 vehicle theft; (2) a 2008

4   probation search; (3) a 2011 assault at an Old Sacramento parking garage; (4) petitioner's

5   admission of gang membership to a police officer; and (5) petitioner's validation as a gang

6   member by the Sheriff's Department; as well as his testimony that (6) the police reports

7   collectively documented petitioner having been contacted in the company of more than 20

8   validated Oak Park Blood members and seven associates.  Id. at 14.

9          B.  The Clearly Established Federal Law

10          The erroneous admission of evidence violates due process only if the evidence is so

11   irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v.

12   McGuire, 502 U.S. 62 (1991).  Otherwise, evidentiary ruling are matters of state law that do not

13   support federal habeas relief.  Id. at 67-68; see also Pulley v. Harris, 465 U.S. 37, 104 S. Ct. 871,

14   79 L. Ed. 2d 29 (1984).

15          The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

16   enjoy the right to . . . be confronted with the witnesses against him."  The Confrontation Clause

17   prohibits the admission of testimonial out-of-court statements by non-testifying individuals.

18   Crawford v. Washington, 541 U.S. 36 (2004).  Not all hearsay implicates the core concerns of the

19   Confrontation Clause; the dispositive question is whether the statement is "testimonial."  Id. at 51.

20   A statement is testimonial only when its primary purpose is the development of evidence to

21   support a prosecution.  Davis v. Washington, 547 U.S. 813, 822 (2006); Michigan v. Bryant,

22   562 U.S. 344, 359 (2011).

23          C.  The State Court's Ruling

24           This claim was raised on direct appeal.  Because the California Supreme Court denied

25   discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

26   decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

27   501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

28   ///

The appellate court ruled in pertinent part as follows:

> *The Error In Allowing The Prosecution's Expert To Relate Some Case-Specific Testimonial Hearsay In Explaining The Basis Of His Opinions Was Harmless Beyond A Reasonable Doubt*
>
> Citing <u>Crawford v. Washington</u> (2004) 541 U.S. 36 [158 L.Ed.2d 177], defendant contends his Sixth Amendment right to confront and cross-examine witnesses was violated when the prosecution's gang expert was allowed to rely on and present testimonial hearsay to the jury in explaining his opinions.
>
> Very recently, in <u>People v. Sanchez</u> (2016) 63 Cal.4th 665 (<u>Sanchez</u>), the Supreme Court "clarified] the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony" (id. at p. 670) and disapproved of <u>People v. Gardeley</u> (1996) 14 Cal.4th 605 "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules" (<u>Sanchez</u>, at p. 686, fn. 13). The court adopted the following rule: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (<u>Id.</u> at p. 684.)
>
> In light of <u>Sanchez</u>, we find that some of the out-of-court statements related by the prosecution's gang expert were case-specific and testimonial and thus should have been excluded under <u>Crawford</u>, but we conclude that their admission was harmless beyond a reasonable doubt based on other properly admitted evidence. We explain below, starting with the law and then applying that law to the facts here.
>
> A
>
> *Applicable Law*
>
> "The admission of expert testimony is governed not only by state evidence law, but also by the Sixth Amendment's confrontation clause, which provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' " (<u>Sanchez</u>, <u>supra</u>, 63 Cal.4th at p. 679, quoting U.S. Const., 6th Amend.) In <u>Crawford</u>, the United States Supreme Court held that the admission of testimonial hearsay against a criminal defendant violates the confrontation clause unless the declarant is unavailable to testify and the defendant had a prior opportunity for crossexamination. (<u>Crawford v. Washington</u>, <u>supra</u>, 541 U.S. at p. 59 & fn. 9 [158 L.Ed.2d at p. 197 & fn. 9].) "[A] court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the Crawford limitations of

unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay, as the high court defines that term." (Sanchez, at p. 680.) Improper admission of hearsay constitutes state law statutory error subject to the harmless error test set forth in People v. Watson (1956) 46 Cal.2d 818. (Sanchez, at pp. 698-699.)

Improper admission of testimonial hearsay implicates constitutional rights and is therefore subject to the harmless error test set forth in Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705]. (Sanchez, supra, 63 Cal.4th at pp. 698-699.)

"While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. . . . In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. . . . . An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (Sanchez, supra, 63 Cal.4th at p. 675.)

"The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (Sanchez, supra, 63 Cal.4th at p. 676.) "By contrast, an expert has traditionally been precluded from relating case-specific facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (Ibid.) "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (Id. at p. 684, fn. omitted.) Sanchez "does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (Id. at p. 685.) "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven." (Ibid.)

B

*The Gang Expert Related Some Hearsay Statements, And Some Of*

*Those Were Testimonial*

Defendant contends that his right to confront the witnesses against him was violated when Detective Houston related the contents of police reports to the jury. He challenges all the evidence based on the police reports, which he claims were about 20, except for a June 2011 report that Detective Houston wrote based on his personal knowledge. Some, but not all, of Detective Houston's testimony about the reports was testimonial hearsay under Sanchez, but as we explain, the admission of the testimonial hearsay was harmless beyond a reasonable doubt.

1. *Evidence Of The Conduct Underlying Three Of The Approximately 20 Police Reports Related Testimonial Hearsay*

Defendant correctly identifies testimony about three police reports as being testimonial hearsay under Sanchez because these reports documented official investigations of completed crimes. These were: (1) a 2007 vehicle theft; (2) a 2008 probation search; and (3) a 2011 assault at an Old Sacramento parking garage. As to these three incidents, Detective Houston did relate case-specific facts outside his personal knowledge, as prohibited by Sanchez. (Sanchez, supra, 63 Cal.4th at pp. 676, 683.) As to the 2007 vehicle theft, defendant was the driver of a stolen car when he was pulled over by police with other Oak Park Bloods in the car. As to the 2008 probation search, defendant was with other Oak Park Bloods during a probation search that uncovered four handguns and one rifle. As to the 2011 assault, defendant was driving a car in an Old Sacramento parking lot with Semaj Douglas and at least one other Oak Park Bloods member/affiliate when defendant violently responded to being called out by a motorist for cutting in line to exit the garage. Defendant pointed a gun at the victim's car and said, "yeah, motherfucker, you better recognize, bitch."

2. *Evidence Of Defendant Being Seen In The Company Of Other Oak Park Bloods Was Not Improper Hearsay; The Expert Did Relate Inadmissible Hearsay Regarding Defendant's Admission Of Gang Membership And The Sheriff Department's Validation Of Defendant As An Oak Park Blood*

Defendant identifies other testimony that he contends was improper under Sanchez by "implication." Defendant appears to be referring to the following testimony by Detective Houston: "I've reviewed approximately 20 documented contacts with [defendant] over the years . . . I found information that [defendant has] been validated twice as an Oak Park Blood by the Sheriff's Department. He admitted back in 2008 to Officer Hoffman that he was an Oak Park Blood." "I've found that he's been contacted in the past with 20 different validated or known members of the Oak Park Bloods, approximately seven associates of the Oak Park Bloods and two other people [who] aren't validated."

As to the evidence about defendant generally being seen in the company of Oak Park Bloods, this did not violate Sanchez because the detective did not convey testimonial or case-specific hearsay.

11

Generalized information that defendant was present for police

contacts was background information about which a gang expert may testify.

(See Sanchez, supra, 63 Cal.4th at p. 676 [common law has traditionally distinguished between "generally accepted background information and the supplying of case-specific facts" "relating to the particular events and participants alleged to have been involved in the case being tried"].)

But, as to evidence that defendant admitted to police he was an Oak Park Blood and that the sheriff's department twice validated that defendant was an Oak Park Blood, this evidence was inadmissible hearsay because it consisted of out-of-court statements admitted for their truth. (See Sanchez, supra, 63 Cal.4th at p. 674 [discussing state evidentiary rules for hearsay].)

[fn: We need not reach the issue of whether this evidence was also testimonial, implicating defendant's Sixth Amendment rights, because our prejudice analysis below applies the heightened standard of review, based on the erroneously admitted information in the police reports that unequivocally implicated defendant's Sixth Amendment rights.]

C

*The Improper Admission Of Some Of The Gang Expert's Testimony Was Harmless Beyond A Reasonable Doubt*

As defendant recognizes, all the challenged evidence tended to show he was an Oak Park Blood. But even if the evidence we have determined was improperly admitted had been excluded, there was a plethora of other evidence that proved defendant was an Oak Park Blood and that his involvement in the current shooting was gang related.

Detective Houston testified he personally contacted defendant, Semaj Douglas, and Jimmy Van on July 29, 2011, the latter two he knew to be Oak Park Bloods. Defendant was driving a car with the other two inside, and Douglas had a gun on him. As a follow-up to that incident, Detective Houston executed a search warrant on Douglas's house, during which he found a letter from Oak Park Blood gang member Miguel Soto addressed to Douglas in which Soto suggested gang monikers for defendant. Gang monikers are something that gang members earn by proving themselves worthy in the eyes of their gang. Detective Houston also testified from personal knowledge that defendant "has two gang-related tattoos on his person." One read "RIP Nimmo," which was a reference to the death of Oak Park Blood gang member Manuel Mercado who died in a vehicle roll-over collision. The second tattoo read, "1920" in red numbers, which Detective Houston explained stood for the 19th and 20th letters of the alphabet, "S" and "T." "ST" was an abbreviation for "Stuna," a clique within the Oak Park Bloods. Detective Houston also had read texts on defendant's cell phone. In

many incoming texts, defendant was referred to as "FAB," an acronym meaning Fourth Avenue Bloods. The texts also contained references to the criminal goings-on of the Oak Park Bloods. These texts were not hearsay because they were not admitted for their truth, but rather, to show references to FAB and Bloods associated with defendant and his phone.

In addition, there were also the circumstances surrounding the current shooting, demonstrating it was gang related. Specifically, two hours before the shootings of Washington and Lawrence, a group of Oak Park Blood gang members was shot at the AM/PM gas station market. One of the victims of that shooting was defendant's friend Wesley (Wes) Taylor.

In sum, given the evidence of the current shooting and the properly admitted evidence that was personally observed by Detective Houston, the jury still would have concluded that defendant was an Oak Park Blood and his involvement with the current shooting was gang related, without resorting to the improperly admitted evidence. Thus, the error was harmless beyond a reasonable doubt.

Lodged Doc. 6 (ECF No. 10-15) at 6-12.

D.  Objective Reasonableness Under § 2254(d)

1.  The State Court's Determination of Which Statements Violated *Crawford*

Petitioner contends first that the California Court of Appeal "incorrectly held" that the only testimonial hearsay statements in Detective Houston's testimony were those regarding the facts of the 2007 vehicle theft, the 2008 probation search, and the 2011 assault.  ECF No. 1 (petition) at 15.  Petitioner argues that additional hearsay testimony based on Detective Houston's review of the police reports—that petitioner had once told a police officer he was a member of the Oak Park Bloods, that he had been twice validated as a gang member by the Sheriff's Department, and that he had been present with gang members and associates on numerous unspecified occasions—also violated Crawford.  Petitioner, who is represented by counsel, provides little more than conclusory briefing on the central question his claim presents: whether finding hearsay to be non-testimonial on the grounds it is "background" information constitutes an unreasonable application of Crawford.  See ECF No. 1 (petition) at 13; ECF No. 19-1 (memorandum in support of traverse) at 5-7.

The undersigned is troubled by that proposition, as information contained in police reports of criminal investigations and documentation of law enforcement contacts with and surveillance

13

1   of gang members and associates, unlike police "business records" such as booking forms, is

2   generally collected for the purpose of developing evidence to support prosecutions.  That is the

3   working definition of "testimonial" hearsay.  See Davis, 547 U.S. at 822; Bryant, 562 U.S. at 359.

4   Accordingly, the undersigned questions whether the California court reasonably applied Crawford

5   and progeny in finding that the "background information" referenced in Detective Houston's

6   testimony was "non-testimonial."   On the other hand, the U.S. Supreme Court has not addressed

7   the precise issue presented here, which may doom petitioner's unreasonable application theory.

8   See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam) (if no Supreme Court

9   precedent controls a legal issue raised by a habeas petitioner in state court, the state court's

10   decision cannot be contrary to, or an unreasonable application of, clearly established federal law).

11   Neither party has adequately briefed the question.

12        The court need not undertake analysis of this issue in the first instance, however, because

13   even if the Crawford violations were more numerous than those identified by the California Court

14   of Appeal and that portion of its decision was unreasonable, application of the harmless error

15   doctrine would preclude relief.

16              2.  The State Court's Harmless Error Analysis Was Not Unreasonable

17        Confrontation Clause violations are subject to harmless error analysis under Chapman v.

18   California, 386 U.S. 18 (1967) (error harmless if it is clear beyond a reasonable doubt that a

19   rational jury would have found the defendant guilty absent the error).  Delaware v. Van Arsdall,

20   475 U.S. 673, 684 (1986).  When a state court finds a constitutional error harmless, the federal

21   habeas court must determine whether *"the harmlessness determination itself"* was unreasonable

22   under AEDPA.  Fry v. Pliler, 551 U.S.112, 119 (2007) (emphasis in original).

23        The effect of constitutional error is evaluated in light of the evidence presented at trial,

24   considered as a whole.  Mata v. Ricketts, 981 F.2d 397, 398 (9th Cir. 1992) (per curiam), cert.

25   denied, 513 U.S. 968 (1994).  Here petitioner does not argue that the murder and attempted

26   murder verdicts, or the verdicts on the gun counts, were unfairly influenced by the testimonial

27   ///

28   ///

hearsay regarding gang affiliation;[2] the claim is focused on the evidence supporting the gang enhancements.  On that point, the appellate court reasonably concluded that admission of the hearsay was harmless beyond a reasonable doubt.

The state court applied the correct harmless error standard, and its analysis of the issue was not objectively unreasonable.  The court emphasized that Detective Houston had testified to his personal encounters with petitioner, including observation of petitioner's gang-related tattoos[3] and contacts with petitioner while he was in the company of known gang members.  The jury had received properly admitted evidence that petitioner had a gang moniker and that text messages on his phone included numerous references to gang activities.  Perhaps most significantly, the circumstantial evidence supported an inference that the shooting in which petitioner participated was an act of retaliation for the shooting of a gang member who was petitioner's friend.  It was not objectively unreasonable for the court to rely on this body of evidence to find that "the jury still would have concluded that defendant was an Oak Park Blood and his involvement with the current shooting was gang related, without resorting to the improperly admitted evidence." Lodged Doc. 6 (ECF No. 10-15) at 12.

Even if Detective Houston's additional references to the contents of police reports constituted additional <u>Crawford</u> violations, petitioner would not be entitled to relief.  The state court's harmless error analysis does not rely on *any* hearsay evidence, testimonial or not, to uphold the verdicts despite the <u>Crawford</u> violations.  And even if conducting de novo review, this court would concur that the properly admitted evidence amply supported the jury's findings that the offenses were committed for the benefit of a gang: the circumstances of the shooting, in

---

[2]  Any such argument would fail.  The evidence of the substantive offenses was more than sufficient to support the verdicts, the prosecutor did not argue or imply that petitioner's gang involvement was evidence of his involvement in the shooting, and the jury was properly instructed in all material respects.  Accordingly, there is no reason to think that the jury's exposure to the testimonial hearsay affected its verdicts on murder, attempted murder, and discharging a firearm.  The only question is the effect of the hearsay on the jury's findings that the offenses were committed for the benefit of a gang.

[3]  Petitioner disputes the probative value of the tattoo evidence, but at this juncture the evidence must be viewed in the light most favorable to the verdict.  The significance of the tattoo evidence is simply not subject to relitigation here.

apparent retaliation for a rival gang's attack on petitioner's gang-member friend; Detective

Houston's own prior contacts with petitioner; petitioner's tattoos; references to his gang moniker;

and the gang references found on his cell phone.  In light of the evidence as a whole, the

undersigned concludes beyond a reasonable doubt that a rational jury would have found the gang

allegations true even without reference to the hearsay introduced by Detective Houston.

II.   Claim Two: Ineffective Assistance of Trial Counsel

A.   Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that trial counsel rendered ineffective assistance of counsel by (1) failing

to object to double hearsay testimony regarding petitioner's statements to his father, and

(2) failing to exclude the videotape of petitioner's in-custody conversation with his father.  ECF

No 1 at 17-20.

B.   The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a

petitioner must show (1) that counsel's representation fell below an objective standard of

reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not

address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

C.   The State Court's Ruling

The state appellate court addressed this claim as follows:

> *Trial Counsel Was Not Deficient In Failing To Object To Hearsay*
> *Evidence Regarding Defendant's Statements To His Father About*
> *The Shooting Relayed By The Father To The Confidential*
> *Informant*
>
> Defendant contends his trial counsel was ineffective for failing to
> object on hearsay grounds to the testimony of defendant's father
> that implied defendant had admitted to the shootings. The evidence
> to which defendant is referring is the testimony of defendant's

father that he remembered discussing the murder investigation with the confidential informant. The father told the confidential informant that he (the father) had asked defendant, "Why did you do it?" Defendant's father then told the informant that defendant replied, "Just because." Then the father told the informant that he recalled asking his son, "What's wrong with you?"

The father's testimony about what he told the informant that defendant said to him presented two levels of hearsay, and while the second level (what the father said to the informant) was not subject to a hearsay exception, the first level (what defendant said to his father) was subject to a hearsay exception.

[fn: The father's statement to the confidential informant about what defendant said was indeed hearsay. Although defendant's incriminating statement to his father was admissible as an admission of a party (Evid. Code, § 1220), the father's statement to the confidential informant was hearsay because it was made out of court and admitted at trial for its truth (Evid. Code, § 1200, subd. (a)).]

However, as we explain, counsel was not deficient in failing to object because the damaging information would have come in one way or another. (See Strickland v. Washington (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] [deficient performance is the first prong of an ineffective assistance of counsel claim].) When trial counsel was faced with the father's testimony about his conversation with the informant, trial counsel could have reasonably feared that if he made a successful hearsay objection, the prosecutor would then have asked the father directly whether the father and defendant had ever spoken about defendant's involvement in the shooting. At this point, the father could have responded in three ways, none of which would have benefited defendant. One, consistent with testimony he gave at an earlier Evidence Code section 402 hearing, the father could have testified he and defendant never discussed the shooting. In that event, the father's contrary statements to the informant would have been admissible as prior inconsistent statements. (Evid. Code, §§ 770, 1235.) Two, consistent with testimony he gave at the preliminary hearing, the father could have testified that he and defendant discussed the shooting, but defendant denied being involved. Again, however, the father's contrary statements to the informant would have been admissible as prior inconsistent statements. Or three, the father could have simply testified directly to the same thing he told the informant (without actually discussing his conversation with the informant) -- that he asked defendant why he did it and defendant replied, "Just because."

Given the possibility of any of these questions and answers, trial counsel could have reasonably decided that objecting on hearsay grounds was a no-win proposition. At best, the evidence of the father's statements to the informant would have eventually been admitted anyway as inconsistent statements. At worst, a hearsay objection by trial counsel could have spurred direct testimony that defendant admitted committing the crimes. Trial counsel's failure to

object on hearsay grounds was therefore not deficient.

*Counsel Was Not Deficient For Failing To Object To Defendant's Postarrest "Silence" To His Father Because There Was Nothing Particularly Incriminating About Defendant's Silence Or Statements, And The Defense Used Them To Defendant's Advantage*

Defendant contends his trial counsel was ineffective for failing to object to defendant's "post-arrest silence to his father, during a conversation at the police station which he knew was being monitored." Specifically, he "contends that his silence was an exercise of his <u>Miranda</u> rights and was, therefore, inadmissible under <u>Doyle v. Ohio</u> (1976) 426 U.S. 610, 618. By failing to object when the prosecutor introduced the videotape, defense counsel provided ineffective assistance."

[fn: In <u>Doyle v. Ohio</u> (1976) 426 U.S. 610 [49 L.Ed.2d 91], the United States Supreme Court held that a person's silence in the wake of <u>Miranda</u> warnings may be nothing more than an exercise of the right to remain silent, and that using that silence to impeach a person's trial testimony would be "fundamentally unfair and a deprivation of due process . . . ." (<u>Doyle</u>, at p. 618 [49 L.Ed.2d at p. 98].)]

We disagree that trial counsel was ineffective. His failure to object was not deficient because trial counsel had a tactical reason to use the videotape to defendant's advantage in closing argument and the videotape was of such little aid to the People that the prosecutor only briefly mentioned it in his rebuttal and not at all to show defendant's guilt or adoptive admissions.

A

*The At-Issue Evidence, Including Background*

The background leading up to the evidence and the evidence itself to which defendant is referring is the following:

In the early morning of October 15, 2008, police officers arrested defendant. That morning, police read defendant his Miranda warnings and then interviewed him. Later that day, detectives allowed defendant to speak with his father in an interview room inside the police department. Just before the father-son conversation, Detective Higgins had told the father "[a]lmost everything" at that point implicated his son in the homicide. The detective also told the father that police believed that defendant knew who the other shooter was and that police wanted to know. The father-son conversation was then recorded by one of two visible cameras and played for the jury.

At the beginning of the conversation, the father asked defendant, "Hey, how's it going?" Defendant responded by pointing to one of the cameras and mouthing, "camera."

The father then told defendant, "they said they have a thumbprint on you from the car, so you got the car. You were looking at the car on Thursday. The victim is denying that. They said they got your, you know, the cell phone tower communicating Florin and Luther at 4:12 in the morning." Defendant asked, "The morning?" and the father responded, "Yeah. Florin and Luther at 4:12 in the morning. They got his cell phone." Defendant responded, "Mm-hmm."

The father then said, "Um, I guess when I went looking for you last night and I guess we told em that, um, you text somebody Aliyah [defendant's girlfriend] or something like that to bring some weed or some shit and I'm like well I don't [know] where the fuck that's coming from."7 Defendant responded, "I told em I was waiting for my dad. I told Aliyah I'm waitin for my dad."

[fn: When conversing with the father right before the father spoke to defendant in the interview room, Detective Higgins told the father "there was a text message as well as a statement by [defendant] about [the father] bringing him some weed the night before" and that "it didn't look good for him [the father]. That was a problem for him because of his job."]

The father then said, "they are trying to say that you were involved and stuff like that but they know that you're not the shooter and stuff like that. I -- I'm like, man, what's in your hair?" Defendant responded, "I can't touch it." "So that's sore. Where they gonna move me to now?" The father told him juvenile hall and told defendant, "[t]hey just -- they wanna know who the shooter was." Defendant's response was transcribed as "[u]nintelligible."

The father said, "And a murder investigation so there'll be, um, an investigation and they see a lot of holes in your story. They're looking for the video. He -- did you go to Carl's Jr[.] after you looked at the vehicle?" Defendant's response was transcribed as "[u]nintelligible."

The father said "they" were tapping his phone. Defendant responded, "And they said my phone was where?" The father told him again, "Florin and Luther at four o'clock in the morning" and then said, "[h]e's always pretty upfront with me and straight." Defendant asked, "Who him?" The father did not say, but repeated "[h]e's pretty straight with me" and that "they were saying that you were on the driver's side . . . but they're thinking that whoever was shot was doing some other kinda of dirt, you know, before that happened or whatever." Defendant asked, "Why?" The father said, "Because (unintelligible) shot them and shot Wes, you know, so I don't know." Defendant's response was transcribed as "[u]nintelligible."

B

*The Law And Its Application Here*

In <u>Doyle</u>, the United States Supreme Court held that a person's silence in the wake of <u>Miranda</u> warnings may be nothing more than

an exercise of the right to remain silent, and that using that silence to impeach a person's trial testimony would be "fundamentally unfair and a deprivation of due process . . . ." (Doyle v. Ohio, supra, 426 U.S. at p. 618 [49 L.Ed.2d at p. 98].) However, the California Supreme Court has held that " '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " (People v. Jennings (2010) 50 Cal.4th 616, 661.) " '[A] typical example of an adoptive admission is the accusatory statement to a criminal defendant made by a person other than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true.' " (People v. Silva (1988) 45 Cal.3d 604, 623-624.)

The California Supreme Court has also held a defendant's silence may not be used as an adoptive admission if the defendant has been given Miranda warnings, "suspect[s] the monitoring of his conversation," and intends his silence as an invocation of his constitutional right to remain silent. (People v. Medina (1990) 51 Cal.3d 870, 890-891.)

Given these holdings by the California Supreme Court, the People were wrong to seek to use defendant's silence or evasive answers when his father told him he was suspected of being involved in the shooting as evidence of defendant's guilt. But even though an objection to its use by the defense would have been well taken, counsel's performance was not deficient for failing to raise the issue because counsel had a tactical reason for allowing the People to introduce the videotape, which was made clear in closing arguments.

Preliminarily, we note that the prosecutor never mentioned this videotape in closing argument, which tends to indicate it was an unimportant piece of evidence for the People. However, when it came time for defense counsel's closing argument, counsel urged the jurors to watch all the video clips and use them "as tools to evaluate whether you believe somebody." "Look at him and how he's talking. Look at [him] and the way he's holding himself, carrying himself. He's not this hard-core gangster that [the prosecutor] is portraying him to be . . . . [¶] And use those. Watch them, because those help you fill in the pieces. Those give you a full, better understanding of who [he] is and the kind of person he is." He also used the substantive content of the videotape to argue, "from a common-sense perspective," if the "D.A.'s argument is [correct] that [defendant] is making this up," why "[w]hen this interview happened, when the interview happened when they

brought his dad into the room," "why would [defendant] associate himself with two individuals who were just shot? He would distance himself, as opposed to bringing them together, and that's not what he did."

Despite defendant's counsel's use of the videotape, the prosecutor still did not argue the videotape contained adoptive admissions. The only thing the prosecutor argued in his rebuttal argument as to the videotape was that it actually showed a father who was trying to protect his son and give his son all the information that the father had.

In summary, then, given the beneficial use to which defendant's counsel put the videotape (i.e., using the videotape to show defendant did not appear to be a "hard-core gangster" and that defendant had not contrived a story because if he was doing that, he would have made efforts to distance himself from the two victims mentioned during the videotaped conversation), his counsel had a tactical reason for not objecting to the videotape's introduction.

Lodged Doc. 6 (ECF No. 10-15) at 13-19.

### D.  Objective Reasonableness Under § 2254(d)

The California Court of Appeal applied the standard required by Strickland, supra, and its analysis was not objectively unreasonable.  As to both the hearsay issue and the Doyle error, the state court found that there were legitimate strategic reasons for counsel not to object.  The U.S. Supreme Court has repeatedly found habeas relief unavailable on Strickland claims where the trial record as a whole indicates that a defense or objection urged in habeas would have been futile or might have been reasonably rejected due to potential downsides.  See, e.g., Richter, 526 U.S. at 108 (habeas relief unavailable where a competent attorney "might" have made a strategic decision not to present expert opinion testimony).

As the Supreme Court emphasized in Strickland itself, "[j]udicial scrutiny of counsel's performance must be highly deferential."  466 U.S. at 694.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

21

1  Id. at 694-95 (citation omitted).

2      Moreover, review of a Strickland claim under the AEDPA requires a double dose of

3  deference.  Richter, 562 U.S. at 105.  "When § 2254(d) applies, the question is not whether

4  counsel's actions were reasonable. The question is whether there is any reasonable argument that

5  counsel satisfied Strickland's deferential standard."  Id.  Under this doubly deferential standard, it

6  was not objectively unreasonable for the state court to conclude that counsel's performance fell

7  within the "wide range of reasonable performance" that Strickland contemplates, and that the

8  challenged action "might be considered sound trial strategy."  See Strickland, 466 at 694-95.

9  Relief on this claim is therefore unavailable.

10      III.    Claim Three: Prosecutorial Misconduct in Closing Argument

11          A.  Petitioner's Allegations and Pertinent State Court Record

12      Petitioner alleges that his due process rights were violated by the prosecutor's

13  misstatements in closing argument regarding the presumption of innocence and the burden of

14  proof.  ECF No. 1 at 20-21.  The prosecutor stated:

15          The presumption of innocence is now lifted. Okay. Yes, you're
           supposed to presume him innocent until you're at this juncture.
16          Now the evidence is in. Now you can decide what the evidence is.
           He's no longer presumed innocent if you start finding that the
17          evidence is pointing to him. . . .

18  RT 869 (ECF No. 10-8 at 231).

19      The prosecutor's argument is quoted at greater length by the California Court of Appeal in

20  the portion of its opinion excerpted below.

21          B.  The Clearly Established Federal Law

22      In reviewing prosecutorial misconduct claims, "[t]he relevant question is whether the

23  prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a

24  denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations

25  omitted).  "To constitute a due process violation, the prosecutorial misconduct must be of

26  sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer v.

27  Miller, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged

28  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."

Smith v. Phillips, 455 U.S. 209, 219 (1982).  "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned."  Darden, 477 U.S. at 181.

### C.  The State Court's Ruling

The state appellate court ruled in pertinent part as follows:

> *Defendant's Contention Regarding Prosecutorial Misconduct In Closing Argument Is Forfeited; Defendant's Trial Counsel Was Not Deficient For Failing To Object*
>
> Defendant contends the judgment must be reversed because the prosecutor committed misconduct in closing argument. Defendant has forfeited his contention by failing to object to the argument in the trial court. His backup ineffective assistance of counsel argument fares no better, as his counsel was not deficient for failing to object to an argument that was not misconduct.
>
> A
>
> *The Prosecutor's At-Issue Argument*
>
> During his rebuttal closing argument, the prosecutor stated as follows:
>
> "*The presumption of innocence is now lifted. Okay. Yes, you're supposed to presume him innocent until you're at this juncture. Now the evidence is in. Now you can decide what the evidence is. He's no longer presumed innocent if you start finding that the evidence is pointing to him.*
>
> "Your job as jurors is to find him guilty beyond a reasonable doubt. Reasonable doubt asks you to compare all of the evidence, all of it, and then make your decisions.
>
> "[Y]ou have the benefit of all of this evidence, all of it, and you need to put your minds together, put it together, and decide what it means. That's your job. You're in a much better position than I am, than [defense counsel] is, than the police officers are, than anyone else in this case because you have a box. In that box goes all the facts of this case and the law, and you are now going to sort out what happened, what is the truth, what is the truth about what happened . . . .
>
> "What really happened? You have the facts. You decide what they mean, you apply the law, and you find him guilty, if it's there. You are not advocates. You are smart beings who have experiences in life that qualify you to sit as jurors and use logic and reason and decide what happened in this case.
>
> "That's your job. I recognize it's intimidating, but it's important. I ask that you take this task very seriously and you apply it, you apply yourselves with logic, logic and common sense. This is a decision that's based in reason. It's reasonable doubt. Okay."

(Italics added.)

B

*Defendant Has Forfeited His Contention That The Prosecutor Committed Misconduct*

Defendant contends the prosecutor committed misconduct and violated his Fourteenth Amendment right to due process by misstating the law and reducing the People's burden of proving each element of the offenses beyond a reasonable doubt. To preserve a claim of prosecutorial misconduct, trial counsel must make a timely objection on the same ground and request that the jury be admonished to disregard the impropriety. (People v. Thornton (2007) 41 Cal.4th 391, 454.) Trial counsel made no objection here, so this contention is forfeited.

C

*Counsel Was Not Deficient In Failing To Object*

Defendant contends that if he forfeited his misconduct argument, his counsel was ineffective for not objecting. Defendant's trial counsel was not deficient, because the prosecutor's argument was not misconduct. (See Strickland v. Washington (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] [first prong of an ineffective assistance claim is deficient performance].)

"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (People v. Panah (2005) 35 Cal.4th 395, 462.) In Panah, the "[d]efendant contend[ed] that the prosecutor improperly appealed to the prejudices and passions of the jury, and denigrated the presumption of innocence, when he argued that the prosecution's evidence had 'stripped away' defendant's presumption of innocence." (Id. at p. 463.) Our Supreme Court "disagree[d]. '[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper.' [Citation.] Here, the prosecutor's references to the presumption of innocence were made in connection with his general point that, in his view, the evidence, to which he had just referred at length, proved defendant's guilt beyond a reasonable doubt, i.e., the evidence overcame the presumption." (Ibid.)

The same is true here. In the prosecutor's closing argument, he began by explaining in detail all the evidence in the case and how it pointed to defendant's guilt, stressing defendant's fingerprint on Lawrence's car was "the biggest piece of evidence in this case" and that the phone records were "very powerful" evidence

"illustrati[ng] . . . the scheming of this murder." In the rebuttal argument, the prosecutor made the limited, confined statement about "[t]he presumption of innocence [being lifted]." He reminded the jurors that "now that the evidence was in, the evidence has proven defendant guilty beyond a reasonable doubt." This was within the range of argument allowed.

Lodged Doc. 6 (ECF No. 10-15) at 19-22.

### D.  Objective Unreasonableness Under § 2254(d)

As a preliminary matter, respondent argues that this claim is procedurally defaulted because petitioner's trial counsel failed to make a contemporaneous objection to the prosecutor's statements during closing argument.  ECF No. 9 at 34-37.  The state court of appeal recognized that the failure to object forfeited this claim, but nevertheless reached its merits in the context of the related ineffective assistance of counsel claim that petitioner asserted in an attempt to avoid default.  Id.  A federal habeas court may bypass a procedural default to reach the merits of a non-meritorious claim.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  The court elects to do so with respect to this claim.[4]

The California Court of Appeal reasonably found that when the prosecutor's closing argument is evaluated as a whole, the challenged references to the presumption of innocence fall within permissible bounds.  Having reviewed the closing arguments in their entirety, and in light of the entire trial record, the undersigned agrees.  The statement from the prosecutor's rebuttal that is quoted by petitioner is, when stripped of its context, potentially misleading as to the presumption of innocence.  However, the clear gist of the argument overall is that the presumption has been overcome by the evidence.  That is a perfectly permissible, indeed almost obligatory, argument for the prosecutor to make.

///

---

[4] The Ninth Circuit has recognized that California's contemporaneous objection rule is an independent and adequate state law ground for rejecting a claim that will support default in federal court.  See Zapata v. Vasquez, 788 F.3d 1106, 1111-12 (9th Cir. 2015); Fairbank v. Ayers, 650 F.3d 1243, 1256-57 (9th Cir. 2011).  Default can be excused on a showing of cause and prejudice, however, and ineffective assistance of counsel is a cognizable "cause."  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  Accordingly, the sate court's resolution of the performance prong of the IAC claim becomes the focus of this court's review one way or the other.

Moreover, the jury was correctly instructed regarding the presumption of innocence and the prosecutor's burden of proof.   A jury is presumed to follow its instructions.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Accordingly, the record does not support a conclusion that the prosecutor's statements infected the trial with fundamental unfairness.  See Darden, 477 U.S. at 181.   For all these reasons, the state court's rejection of this claim may not be disturbed.

IV.    Cumulative Error

Petitioner alleges that the cumulative effect of the errors so infected his trial with unfairness as to violate due process.  ECF No. 1 at 22.  The state court denied this claim, stating that because the only error was "harmless error with respect to [the] gang expert's testimony, there are no errors to accumulate."  Lodged Doc. 6 (ECF No. 10-15) at 22.  This conclusion is not unreasonable.  To the contrary, although multiple errors that are harmless individually may be so prejudicial when considered together that they rise to the level of a due process violation, see Chambers v. Mississippi, 410 U.S. 284, 290 n. 3 (1973), the only errors at petitioner's trial were reasonably found to be harmless beyond a reasonable doubt as discussed above.  Accordingly, a cumulative error claim necessarily fails.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied and that the court decline to issue aa certificate of appealability, see 28 U.S.C. § 2253(c)(2).

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are

///

///

advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  June 1, 2023.


ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE